**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CRIMINAL ACTION NO. 3:12-CR-104-RGJ-CHL-2**

JOHN HATTON,                                                    **Movant/Defendant.**

v.

UNITED STATES OF AMERICA,                                      **Respondent/Plaintiff,**

## REPORT AND RECOMMENDATION

This matter is before the Court on a Motion and Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (collectively "§ 2255 Motion") filed by Movant/Defendant John Hatton ("Hatton").  (DNs 338, 377.)  This matter is referred to the undersigned for findings of fact and recommendations on any dispositive matter.  (DN 379.)  The United States responded to Hatton's § 2255 Motion, and Hatton filed a reply.  (DNs 343, 399, 401.)  Because the undersigned determined that Hatton's § 2255 Motion and the case record did not conclusively show he was entitled to no relief, the undersigned conducted an evidentiary hearing on August 12, 2022.  (DNs 430, 435, 436.)  Both Hatton and the United States submitted post-hearing briefs.  (DNs 441, 442.)  Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned **RECOMMENDS** that Hatton's § 2255 Motion (DNs 338, 377) be **DENIED** and that a Certificate of Appealability be **DENIED** as to all claims therein advanced.

## I.    FINDINGS OF FACT

### A.    Factual and Procedural Background

The following recitation of facts is taken from the majority opinion of the Sixth Circuit on Hatton's direct appeal:

On Friday, October 21, 2011, at about 6:00 p.m., John Hatton attempted to rob the M & I Smoke Shop, a small convenience store in Louisville.  Holding a revolver, Hatton ordered the proprietor, "Give me all your money or I'll kill you...."  The shop owner wrested the revolver away from him.  When Hatton tried to flee, the owner shot him in the leg.  The entire incident was captured by the store's video security cameras.  Hatton was held on state criminal charges.

Three months earlier, in July 2011, Louisville Metro Police Department had begun investigating a series of armed robberies.  Eight armed robberies—some by a white female, some by a male at a location the woman had robbed, and some by a white female accompanied by a male—left the police with a suspicion that all the robberies were committed by a robbery ring connected to the white female.  These robberies included a September 23, 2011 bank robbery by a white female and a white male a month before Hatton's arrest and a January 23, 2012 robbery of the same bank by a white female and a black male three months after Hatton's arrest.

Around January 28, 2012, a few days after the second bank robbery fitting the pattern of the white-female led ring, the police received a tip from a parent whose child went to school with the child of a white female named Jillian Wojciechowski.  Specifically, the parent overheard Wojciechowski's daughter say that her mother, Wojciechowski, had been on the news for robbing a bank.  The police identified the getaway car from the January 2012 bank robbery as Wojciechowski's.  Thus, Wojciechowski became the primary suspect in the robbery ring, along with her live-in boyfriend, Dean Ridge.  Over the next several months, the police conducted surveillance of Ridge and Wojciechowski.  In March 2012, police photographed Wojciechowski in the company of two black males, Joshua Ewing and Vincent Coleman.

Police learned of Wojciechowski's and Ridge's ties to Coleman when they tracked Wojciechowski's car to an overnight stay at Coleman's wife's home.  Coleman sold Wojciechowski and Ridge drugs and guns that were used in various armed robberies.

Meanwhile, with her husband in jail, Hatton's wife, Sara, took action.  In mid-April 2012, she called the Louisville Metro Police offering to help build a drug trafficking case against an acquaintance of hers, Jillian Wojciechowski.  Sara Hatton said she was volunteering her help to qualify her husband for a shorter sentence for the smoke shop offense.  Sara Hatton gave no indication that her husband had requested or in any way procured her cooperation with the authorities.

Investigators had Sara Hatton record telephone conversations with Wojciechowski.  Sara Hatton next recorded Wojciechowski selling her drugs and discussing a bank robbery.

Days after Sara Hatton's undercover meeting, investigators arrested Wojciechowski and Ridge and searched their house. Wojciechowski submitted to questioning by detectives, and she confessed her role in the bank robberies.

During that first interrogation, Wojciechowski told detectives she had an accomplice in the first bank robbery: John Hatton. Wojciechowski later accused Sara Hatton of complicity as well. Hatton and Ridge had met each other about six months before the September 23, 2011 bank robbery. The night before the September 23 bank robbery, the Hattons went to Wojciechowski's and Ridge's home to spend the night. The four of them discussed robbing Your Community Bank, where Ridge had an account.

Sara Hatton had worked in banking and gave advice on how to avoid dye packs, bait bills, and silent alarms that would be triggered by removing money from teller drawers. Sara explained getting money from the vault could avoid those alarms. Sara, who was pregnant, was not going along with the others on the robbery, but participated in the planning by providing her advice. The next day, Ridge drove Hatton and Wojciechowski to the Your Community Bank in Hatton's Jeep Cherokee. Ridge sat in the car as Hatton and Wojciechowski went into the bank.

Multiple bank surveillance cameras captured the robbery on video. While Hatton wore a ski mask, the jurors could thus compare the male bank robber's stature and few visible features of Hatton's.

The robbers got a total of $120,721.62. Ridge drove Hatton and Wojciechowski to an empty house he was painting and split the money, one-half for Hatton, and one-half for Wojciechowski.

Wojciechowski and Ridge were both taken into custody on May 16, 2012. Wojciechowski said that the then-pregnant Sara Hatton had stayed at Wojciechowski's house during the robbery, and as soon as the crime was done and the robbers had split the money, Hatton rushed back to Wojciechowski's house, picked up his about-to-deliver wife, and sped to the hospital. Sara was admitted to the maternity ward by mid-afternoon, and delivered a baby boy shortly after midnight. Ridge made similar allegations about the Hattons. Sara Hatton was killed in an automobile accident in August 2012.

*United States v. Hatton*, 643 F. App'x 574, 575-76 (6th Cir. 2016) (internal citations omitted).

While only Wojciechowski was charged in the initial federal indictment in August 2012,

Hatton and Ewing were both added in a superseding indictment in March 2013. (DNs 1, 22.)

Hatton was charged with one count of bank robbery for the September 23, 2011, robbery of Your

Community Bank; one count of robbery for the October 21, 2011, M & I Smoke Shop robbery; and two separate counts of brandishing a firearm during a crime of violence during the two robberies.[1]  (DN 22.)  In May 2013, a second superseding indictment added Ridge to the case and a charge of conspiracy to commit bank robbery against Wojciechowski, Ridge, Ewing, and Hatton. (DN 41.)  Hatton's co-defendants were also charged with other bank robberies.  (*Id.*)

At Hatton's May 10, 2013, initial appearance, the Court appointed attorney Brian K. Darling ("Darling") from the Court's Criminal Justice Act panel to represent Hatton.  (DN 50.) After his arraignment on the second superseding indictment, Hatton's trial was initially set for June 19, 2013.  (DN 58.)  On June 7, 2013, Darling filed a motion to continue the trial because he had received "voluminous discovery" approximately a week prior that he had not yet reviewed as of the date Darling filed the motion.  (DN 75.)  Darling also represented that he already had other trials on his calendar and pointed out that the initial trial date had been set out only one month from Hatton's arraignment.  (*Id.*)  At a hearing on the motion to continue, the United States also made an oral motion to continue the trial.  (DN 82.)  The Court granted the continuance, indicating that Hatton's trial would be rescheduled at a later time.[2]  (DN 83.)  Ultimately, Wojciechowski and Ridge entered guilty pleas in lieu of going to trial.  (DNs 84, 85, 88, 103, 105, 109.)  Ewing went to trial on his own in July 2013 and was found guilty of both a January 23, 2012, bank robbery and brandishing a firearm in relation to a crime of violence; the United States did not try Ewing on the conspiracy charge.  (DNs 41, 111.)  That left Hatton as the sole remaining defendant in the case.

---

[1] While the date of the Smoke Shop robbery was wrong in the superseding and second superseding indictments, before Hatton's trial, the United States corrected it in the third superseding indictment.  (*Compare* DNs 22 and 41, *with* DN 165.)

[2] The Court set a trial as to Wojciechowski and Ewing on one of the other robberies in the second superseding indictment only.  (DNs 41, 83.)

The Court set a further proceeding for August 7, 2013, to discuss the status of the case.

(DN 114.)  During the hearing, Darling told the Court:

> Judge, if you remember, I was somewhat of a late arrival in this and kind of stirred the pot and got the bees all going on this back in the latter part of June there. I'm still getting through things. I don't know what date you are looking at for a trial date. I would like to put it as far down the road as possible to set the trial date in the late fall so I can get with Mr. Hatton on some of these other items. Mr. Dyke . . . furnished me with some additional discovery. We have got a stack. I'm trying to separate out what was -- what had been used in the one conspiracy trial already, which is superfluous to Mr. Hatton as to the remaining counts, and also any motions that I have to make on his behalf.

(DN 256, at PageID # 1972.)  The Court set the matter for trial as to Hatton to begin on November 5, 2013.  (DN 117.)

The Court then set the matter for an October 25, 2013, telephonic conference to discuss the upcoming trial.  (DN 149.)  The morning of the conference, Darling filed a motion to continue, (DN 150.)  In it, he argued that while much of the "voluminous discovery" that was provided by May 30, 2013, had been reviewed with Hatton, "other documentation ha[d] not yet been reviewed." (*Id.* at PageID # 629.)  Darling also indicated that Hatton had been moved to a different facility, which made it difficult to visit him, and that the Parties were discussing resolution. Darling wrote, "At this point in time, the undersigned does not believe that theis [*sic*] Defendant's defense is ready, nor will it be ready, for trial as scheduled herein." (*Id.*)  During the conference, when the Court inquired if the Parties were ready for trial, Darling repeated much of what he said in the motion but also stated, "I haven't had a real good chance to go over everything that was – that [the prosecutor] was kind enough to give me back in the spring, early summer," seemingly referencing discovery materials.  (DN 257, at PageID # 1976.)  When told the Parties were discussing resolution, the Court indicated that it felt the trial date should stay on to pressure Hatton

to make a decision on whether to take a plea.  Darling said that was fine but also said, in relation

to some of his discussions with Assistant United States Attorney Tom Dyke:

> On the other hand, if it turns out that the offer and whatever Tom and I come up with is not satisfactory with him, I still got a heck of a lot more to do to go over with him. I mean, I just spent the other day two hours just copying things that still needed to be given to him. You got half a dosage, and now he's got another half dosage going there. That was my thoughts on it. I didn't want to get caught with my pants down. Maybe I made a mistake by kind of putting it on hold for a week or two or three here when Tom said he was going to get back to me. As I told Tom, I'm not trying to throw him under the bus. I probably shouldn't have relied upon that. You try to go with your gut feeling and your experience after 39 years. That's what I was doing. I'm not sure what he's going to do, but his last comment to me was to see what the offer is, and if not, we will try it. Tom and I haven't talked face-to-face about that. I agree with the Court that it might be an incentive for him to go ahead and do something. But Tom has to give us something that will make it an incentive to him obviously.

(*Id.* at PageID # 1989-90.)  Darling repeated that he was not trying to delay anything but said again,

"I'm just trying to make sure me and my client don't get caught with our pants down here."  (*Id.*

at 1981.)  The Court held the motion to continue in abeyance at first but ultimately sustained it and

continued the trial to November 18, 2013.  (DNs 153, 154.)

Darling then proceed to make pretrial filings on behalf of Hatton including a short motion

to dismiss based on the speedy trial act, a motion to sever the trial of the Smoke Shop robbery

from the bank robbery, a motion in limine, and a pretrial memorandum in which he indicated that

he would be presenting an alibi defense through "Mr. Hatton, a representative of the subject

hospital's medical records section and [Hatton's] mother, Lisa Peyton" that Hatton was attending

the birth of his child on the date of the bank robbery.  (DN 177, at PageID # 1238; DN 172; DN

173; DN 181.)  At the conference the Court set to discuss the pending motions (DN 176), which

were denied, Darling said that Hatton had told Darling Hatton had not had sufficient time to go

through a lot of the discovery.  (DN 235, at PageID # 1871.)  Darling made an oral motion to

continue the trial again, but the Court denied the motion.  (DN 186.)

6

Hatton went to trial on November 18-20, 2013. (DNs 229, 230, 231.) Both Wojciechowski and Ridge testified against Hatton. Darling's main defense for Hatton was to emphasize his limp and cast doubt on whether the physical characteristics of the male robber matched Hatton by suggesting it could have been Ridge. In his opening statement, Darling told the jury that Hatton was not present at the bank on the day of the robbery and was instead with his pregnant wife at their home and later at the hospital. He stated that hospital records would show that Sara Hatton was admitted at 2:57 in the afternoon, but he never introduced any hospital records into evidence during trial. In fact, Darling never questioned any witness regarding Hatton's whereabouts on the day of the bank robbery. Darling called only one witness, Hatton's sister Kelsey Payton, and asked her questions about Hatton's physical condition to establish that Hatton wore a brace and walked with a limp.

The jury ultimately found Hatton guilty on all four counts. (DN 192.) The Court scheduled Hatton's sentencing for February 13, 2014. (DNs 192, 224.) On the day of his sentencing hearing, Hatton expressed dissatisfaction with Darling's representation of him. Hatton stated that he hadn't gotten a chance to meet with Darling after he received the presentence investigation report, which Darling disputed. (DN 258, at PageID # 1987.) Hatton said that he didn't trust Darling, denied that he was involved in the bank robbery, felt like Darling had dropped the ball on the alibi witnesses, and that Darling had said to Hatton's mother that it was on Hatton to have the alibi witnesses present. He also said that he asked Darling during trial if he should take the stand and that Darling discouraged him from doing so because it wasn't necessary. (*Id.* at 1988-92.) Hatton ultimately said that he didn't want Darling to represent him, Darling moved to withdraw, and the Court granted the motion. (*Id.* at 1999-2000.)

The Court appointed attorney Mike Mazzoli to represent Hatton.  (DN 228.)  After giving Mazzoli time to prepare, Hatton's sentencing was held on December 16, 2014.  (DN 239, 259.) Hatton was sentenced to total term of 454 months imprisonment; $120,594.62 in restitution; and a three-year term of supervised release.  (DNs 252, 255.)

Hatton appealed his conviction to the Sixth Circuit where he argued that the trial court erred in denying his motion for separate trials on the Smoke Shop and bank robbery, in listing facts for the jury to consider in determining the existence of a nexus to interstate commerce, and in concluding that the court could not consider Sara Hatton's cooperation in determining whether to grant a variance at sentencing.  *Hatton*, 643 F. App'x at 574-75.  The Sixth Circuit affirmed Hatton's conviction.  *Id.* at 582.  In doing so, the majority decision noted that Hatton could not prove prejudice from any misjoinder of charges because "[t]he testimony of both Ridge and Wojciechowski that Hatton was the male robber at the September 23, 2011 bank robbery, combined with other evidence, was overwhelming." *Id.* at 580.  Judge Bernice Donald concurred in part and dissented in part in the judgment, dissenting on "the majority's conclusion that the robbery charges were not misjoined and that any error was harmless."  *Id.* at 582 (Donald, J., dissenting).  Judge Donald found that the record did "not contain substantial evidence of Hatton's guilt in relation to the Your Community Bank robbery."  *Id.* at 585 (Donald, J., dissenting).  She highlighted evidence in the record that Wojciechowski and Ridge had "changed their stories as time went on" such that "a jury might not view these individuals as the most trustworthy sources of information about what occurred during the Your Community Bank robbery."  *Id.* at 585-86 (Donald, J., dissenting).  Regarding testimony about Sara Hatton's purported participation in the robbery, Judge Donald found that "[t]o a jury, it might seem contradictory that Sara Hatton, who was attempting to help her husband receive a lower jail sentence for the Smoke Shop robbery,

8

would assist the police in implicating her husband in the Your Community Bank robbery." *Id.* at 586 (Donald, J., dissenting).  She also found that Hatton's defense that the robber in the bank security footage was Ridge not Hatton was "at least plausible" based in part on testimony that both Hatton and Ridge "were tall and had slender builds, in line with the bank employees' descriptions" and "conflicting testimony about whether Hatton walks with a noticeable limp." *Id.* (Donald, J., dissenting).  Judge Donald also emphasized:

> Moreover, other evidence at trial does not distinguish Hatton as the robber.  Ridge had a bank account at the Your Community Bank location that was robbed, while Hatton did not.  Both Wojciechowski and Ridge spoke of using Hatton's green Jeep Cherokee as the getaway car, but the prosecutor never demonstrated that Hatton owned a green Jeep Cherokee.  The fingerprints and DNA recovered from the Your Community Bank robbery did not indicate who the perpetrator was.  Finally, when Wojciechowski was first arrested, she told the police that Hatton took his share of money with him in the computer bag that the male robber had with him.  However, when the police searched her and Ridge's home, they found two computer bags similar to the ones used during the robbery.

*Id.* at 586-87 (Donald, J., dissenting).  Thus, she concluded, "I do not believe that the government has demonstrated that there was substantial evidence at trial indicating that Hatton is guilty of the Your Community Bank robbery."  *Id.* at 587 (Donald, J., dissenting) (emphasis omitted).

Hatton did not file a petition for writ of certiorari with the United States Supreme Court following the Sixth Circuit's decision.

### B.    Hatton's § 2255 Motion and Grounds for Relief

On November 27, 2017, Hatton filed his initial § 2255 motion in which he alleged four grounds for relief: (1) ineffective assistance of counsel during the presentation of pretrial motions; (2) ineffective assistance of counsel during trial; (3) ineffective assistance regarding a lack of objection to § 924(c) jury instructions; and (4) ineffective assistance at sentencing and on appeal due to counsel's failure to file a petition for certiorari.  (DN 338.)  As to his counsel's presentation of pretrial motions and trial errors, Hatton generally claimed that his counsel failed to investigate

witnesses, secure written statements from witnesses, or subpoena witnesses with exculpatory testimony to testify at trial. (*Id.* at PageID # 2446-47.) He claimed that his counsel failed to object to the jury instructions at trial related to his purported violations of 18 U.S.C. § 924(c) "in relation to the Duplicity [*sic*] of the Hobbs Act conspiracy and Hobbs Act Robbery," failed to raise these errors at sentencing, and also failed to raise this challenge on appeal. (*Id.* at 2447-50.) He also claimed his counsel erred in failing to file a petition for writ of certiorari following the denial of his direct appeal. (*Id.* at 2450.) Hatton's initial § 2255 motion contained no statement of facts or citations to authority support his claimed grounds for relief.

In its response to Hatton's initial motion, the United States claimed that Hatton's motion should be dismissed for failure to state sufficient claims or allege any facts that would entitle him to relief. (DN 343.) Hatton did not file a reply. On March 15, 2018, Magistrate Judge Dave Whalin issued a report and recommendation recommending that Hatton's initial § 2255 motion be summarily denied because Hatton "failed to allege specific factual detail to support any of his four claims of ineffective assistance of trial or appellate counsel." (DN 345, at PageID # 2480.) Following the issuance of Magistrate Judge Whalin's recommendation, the Court received correspondence from Hatton indicating he did not timely receive the United States' response to his motion and was unable to respond due to issues related to his transfer between facilities, which impeded his access to a law library and his ability to research and respond. (DNs 347, 349.) Hatton ultimately filed a number of *pro se* motions seeking to supplement his initial § 2255 motion and have the court take judicial notice of certain items as well as objections to Magistrate Judge Whalin's recommendation. (DNs 354, 356, 357, 359, 360, 363, 364.) While up to that point, Hatton's filings had all been *pro se*, on May 14, 2019, attorney Matthew Robinson entered an

appearance for Hatton and proceeded to seek leave to supplement Hatton's objections and *pro se* motions to amend and supplement.  (DNs 366, 368.)

On May 18, 2020, District Judge Rebecca Grady Jennings addressed Hatton's objections to Magistrate Judge Whalin's recommendation and his other pending motions.  (DN 376.)  Judge Jennings denied Hatton's counsel's request for leave to amend to include a claim based on the First Step Act because the First Step Act did not apply given that Hatton was sentenced prior to the Act's enactment.  (*Id.* at PageID # 2695.)  She granted Hatton leave to amend in all other respects, including his request to supplement the record with affidavits from two potential witnesses.  (*Id.* at 2695-96.)  She also rejected Magistrate Judge Whalin's recommendation as moot "while noting that [she] d[id] not find fault with the R&R" in doing so.  (*Id.* at 2696.)  As a result, Hatton's amended § 2255 motion that he drafted *pro se* was filed in the record.  (DN 377.)  Hatton's counsel did not seek leave to further amend or supplement that motion.

In his amended § 2255 motion, Hatton largely alleged the same grounds for relief he alleged in his initial motion though he was more specific as to the factual basis for his claims.  (*Id.*)  He alleged ineffective assistance of trial counsel based on his trial counsel's (1) failure to investigate evidence and witnesses supportive of Hatton's defenses, including alibi witnesses; (2) failure to adequately prepare for trial; (3) failure to subpoena and call witnesses at trial; and (4) incorrect advice to Hatton regarding his right to testify at trial and actions to prevent Hatton from doing so.  (*Id.*)  He also separately alleged a stand-alone due process claim and a claim of ineffective assistance of appellate counsel.  (DN 377, at PageID # 2701.)

The United States sought multiple extensions of time to file its response to Hatton's amended § 2255 motion and ultimately sought leave to file its response out of time, which was granted.  (DNs 380, 381, 383, 384, 386, 387, 392, 393, 398, 400.)  Hatton's counsel then filed a

reply to the United States' response.  (DN 399.)  On May 24, 2022, the undersigned entered an order indicating an intention to schedule an evidentiary hearing on Hatton's claims of ineffective assistance of trial counsel only.  (DN 430.)  The undersigned then held an evidentiary hearing on August 12, 2022.  (DNs 430, 435, 436.)

### C.      Findings of Fact from Evidentiary Hearing

Three witnesses testified at the Court's evidentiary hearing: Hatton's mother, Lisa Payton ("L. Payton"); Hatton's sister, Kelsey Payton ("K. Payton"); and Hatton's trial counsel, Darling. (DN 438.)  The undersigned will summarize the testimony of each witness below.

### 1.      L. Payton's Testimony

L. Payton testified that she was Hatton's mother and that she had spoken with Darling on a regular basis about her son's case and the strategy for his defense.  (*Id.* at PageID # 3170, 3172.) As part of those discussions, she told Darling about Hatton's noticeable limp/drop foot.  (*Id.* at 3172-73, 3182-83.)  She told him that Hatton had been stabbed in the back of the leg in Florida and admitted to the hospital.  (*Id.* at 3172-73.)  She told him that Hatton had tendon damage and nerve damage and didn't walk right because he couldn't afford necessary surgery to fix the damage.  (*Id.* at 3172-73, 3177.)  She put Darling in touch with her daughter for more information about Hatton's limp.  (*Id.* at 3183.)  She testified that Darling asked her for the name of the Florida hospital, told her he was going to subpoena the records, and told her that he would put her on the stand to testify regarding the limp.  (*Id.* at 3177-78.)  However, despite her being separated from the other witnesses and kept out of the courtroom during trial, Darling never called her to testify. (*Id.* at 3178-79.)

L. Payton testified that Sara Hatton was pregnant at the time of the bank robbery and had her and Hatton's child on September 24.  (*Id.* at 3175-76.)  However, she did not go to the hospital to see them on either September 23 or September 24.  (*Id.* at 3182.)

L Payton testified that she told Darling she knew Sarah Hatton had been planning to "try and get [Hatton] off by turning some people – or wiring up on some people, as she called it."  (*Id.* at 3174.)

L. Payton also testified regarding Hatton's living conditions and financial situation around the time of the bank robbery.  (*Id.* at 3174.)  She testified that right before the bank robbery, "they were on the streets," meaning Hatton, Sara Hatton, and their family.  (*Id.*)  She said that Hatton and his family were going to move into a house in exchange for Hatton doing some carpentry and painting work so the family could stay there for free.  (*Id.* at 3174-75.)  She testified that at one point in July and early August 2011, Hatton and his family were living with her after they had been kicked out of their apartment.  (*Id.* at 3176, 3181.)  She testified that she alerted Darling to Hatton's financial difficulties but, "[h]e never made any kind of remark about it at all."  (*Id.* at 3177.)  In response to cross-examination by the United States, she also testified:

Q:     And you've testified here today that you knew that they didn't have a lot of money at that point.

A:     Right.

Q:     Okay. And you knew that they were, I think you testified, desperate for money, something along those lines.

A:     They were desperate enough that he had to rob a bank at one point – or a smoke shop at one point and – meaning desperate, I guess, yeah, for their children.

Q:     So your testimony then is that he was – your son needed money so much that he was willing to rob someone?

A:     Yes.

(*Id.* at 3181-82.)

Finally, L. Payton testified that when she spoke with Darling the week before trial, on November 13, 2011, Darling said he wasn't ready, "[h]e had not gotten anything done yet," and he was going to ask for another continuance. (*Id.* at 3178.) She testified that she did not think Darling was prepared for trial, saying:

> He said that he was gonna ask for more time. I mean, he never really made it like it was a problem. Afterwards, he just played it off like everything was great and John would be fine. He even said it – you know, it was – it was like he had it all mapped out in his head after the weekend, you know, but before that, it was – he was not prepared whatsoever.

(*Id.* at 3179.)

### 2.    K. Payton's Testimony

K. Payton, Hatton's sister, recalled testifying at Hatton's trial and that she had discussed her testimony with Darling before she was called. (*Id.* at 3185-86.) However, she indicated that she thought she was also going to be asked questions about Hatton's living situation at the time of the bank robbery and how "they were living in a really not so well house in a very bad part of town." (*Id.* at 3186.) She testified, "I believe that, you know, if someone were to rob a bank for however – you know, $60,000, I believe that they would at least have a vehicle. You know what I'm saying?" (*Id.*) She was surprised Darling did not ask her questions regarding this when she testified at trial because they had talked about that. (*Id.* at 3188-89, 3191-92.) She testified that the day after the bank robbery, she took food to the hospital to get Sara Hatton food that was not cafeteria food because the Hattons didn't have money to buy food. (*Id.* at 3189.) She testified that around the time of the bank robbery, she was taking Hatton's oldest son back and forth to school because they did not have a vehicle. (*Id.*)

K. Payton also testified that she knew Hatton and his wife were at the hospital "during the bank robbery" because Sara was giving birth. (*Id.* at 3186-87.) However, she did not go to the

hospital on the day of the bank robbery; she visited the next day, September 25.  (*Id.* at 3187, 3190-91.)  She was not at the hospital before her nephew was born.  (*Id.* at 3190.)  She testified that Darling was certainly aware that the birth of Hatton's son occurred close in time to the bank robbery and that he had told her he was going to raise this as a defense for Hatton.  (*Id.* at 3188.)

K. Payton also testified that she talked to Darling about Hatton's drop foot.  (*Id.* at 3192-93.)

### 3.     Darling's Testimony

Darling testified that he had practiced criminal law since 1974 and that he had been taking cases from the Court's Criminal Justice Act Panel since 1974 and only stopped a few years ago.  (*Id.* at 3200.)  He regularly spends time in federal and state courts.  (*Id.* at 3200-01.)

He testified that, as part of his representation of Hatton, he met with Hatton and members of Hatton's family, including over thirteen phone calls with L. Payton.  (*Id.* at 3201-02.)  He recalled making pretrial motions, including a motion to sever and a motion related to delay.  (*Id.* at 3203-05.)  He met with Hatton at least three times face to face and spoke with Hatton on the phone.  (*Id.* at 3216-17.)

He testified that he received and reviewed discovery from the United States as well as *Jencks* material on Hatton's codefendants that he had requested.  (*Id.* at 3206, 3213.)  He said that in his view, there was "a lot of discovery," and it included state court materials as well as typical federal court discovery.  (*Id.* at 3226.)  He testified that he sent the discovery to Hatton as "best [he] could" due to issues at the time with how much time Hatton could spend on the computer.  (*Id.* at 3206.)  He recalled having a conversation with Hatton a few days before trial about this where Hatton told him Hatton had not had a chance to look at the discovery and asked him to ask for a continuance so he did but it was overruled.  (*Id.* at 3206-07.)  He testified that he was able to

15

prepare for trial and that he "had done loads of work" to prepare.  (*Id.* at 3207.)  He testified that Hatton's hesitance notwithstanding, he "had everything [he] needed" to go forward and that he believed he did effectively prepare for trial.  (*Id.* at 3225.)

He testified that he thought Hatton's limp was a particularly important defense because it "put a big question mark in – or should have in the minds of the jury as to whether [Hatton] was there or not."  (*Id.* at 3208.)  He testified that he called K. Payton to testify regarding this because he thought she made a good witness based on his conversations and interview of her.  (*Id.* at 3209.)  Regarding not having L. Payton testify, he stated, "I didn't think the same of his mother, but she really wasn't going to add anything more than what the sister already had to say."  (*Id.*)

He also testified that he investigated the "timeline" of the bank robbery in preparing the case for trial but that in his view, the birth of Hatton's child didn't exonerate Hatton because there was a gap of time.  (*Id.* at 3210.)  He said,

> If I remember, the bank robbery was in the morning, tenish or something like that. His baby was born later than afternoon, if I remember or the next day, but there was a gap of time there.  And, you know, we couldn't put that on. It would still show opportunity, which is one of the things you do not want, to give the prosecution a chance to prove that a defendant had opportunity to do what he was charged with.

(*Id.* at 3210, 3219.)  He testified that he did look into medical records from the hospital in making this determination.  (*Id.* at 3212.)

He also testified that he had talked about Hatton's financial status several times with Hatton's family and that he knew Hatton was "having a hard time of it."  (*Id.* at 3210, 3210-11.)  He noted that Hatton had raised that as a potential defense to his alleged robbery gains and wanted Darling to get Hatton's bank records to show Hatton's financial status.  (*Id.* at 3211.)  But Darling testified

> Well, people who are bank robbers don't put that money in the bank. Okay? They don't create a trail, and he was trying to say that there is no trail. So, therefore,

16

there's no money in my hands.  I wasn't part of that. I didn't think that would fly. I thought that would come back to haunt him. . . . [I]t wouldn't prove anything. It would not be helpful to his situation.

(*Id.* at 3211.)  He also expressed concern that to get that information in, Hatton would have had to testify, which would have "open[ed] the door to everything about him." (*Id.* at 3212.)  He didn't believe Hatton's financial status had "probative value." (*Id.* at 3220.)

Darling affirmed that he believed his preparation for Hatton's trial was on par with how he has prepared for other trials in his career and that he believed Hatton received effective assistance of counsel. (*Id.* at 3215.)

## II.     CONCLUSIONS OF LAW

### A.     Legal Standard

#### 1.     Standard of Review for § 2255 Motion

A federal prisoner seeking relief under 28 U.S.C. § 2255 "must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *United States v. Doyle*, 631 F.3d 815, 817 (6th Cir. 2011) (quoting *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001)).  To prevail on a § 2255 motion alleging constitutional error, the movant must show that the error had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *Hamblen v. United States*, 591 F.3d 471, 473 (6th Cir. 2009).  The movant must sustain his allegations by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

### 2.    Standard for Ineffective Assistance of Counsel Claim

Claims of ineffective assistance of counsel are properly brought in a § 2255 motion. *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003). The Sixth Amendment entitles a defendant not only to counsel but to counsel that is reasonably effective. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A claim of ineffective assistance of counsel requires the defendant to show that (1) counsel's performance was deficient and (2) that the deficiency prejudiced him. *Id.* Conclusory allegations or bare bones statements regarding counsel's effectiveness fall short of meeting that burden. *See Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000) (finding that "conclusory statement" by petitioner was "wholly insufficient to raise the issue of ineffective assistance of counsel").

To satisfy the first prong of the *Strickland* test, the defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if it fell below an "objective standard of reasonableness" based on "prevailing professional norms." *Id.* at 688. A defendant asserting a claim of ineffective assistance must, consequently, "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 688. The Court is required to evaluate the objective reasonableness of counsel's performance "from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689; *see id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action 'might be considered sound trial strategy.' ").

Under the second *Strickland* prong, the defendant must show "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in

the outcome." *Id.*

### B.    Hatton's Grounds for Relief

Based on the undersigned's review of Hatton's initial and amended § 2255 motions, the

undersigned construes Hatton's filings as having included the following grounds for relief:

(1)    Ineffective assistance of trial counsel based on counsel's failure to investigate generally and to investigate Hatton's financial records and alibi specifically (DN 338, at PageID # 2446; DN 377-1, at PageID # 2702, 2705, 2708, 2710-11);

(2)    Ineffective assistance of trial counsel based on counsel's failure to subpoena and call witnesses at trial (DN 338, at PageID # 2447; DN 377-1, at PageID # 2702-03, 2713);

(3)    Ineffective assistance of trial counsel based on counsel's purported efforts to prevent Hatton from testifying (DN 377-1, at PageID # 2703, 2715, 2717-18);

(4)    Ineffective assistance of trial counsel based on counsel being unprepared for trial (DN 377-1, at PageID # 2719, 2722);

(5)    Ineffective assistance of trial counsel based on counsel's failure to object to § 924(c) jury instructions on grounds of "duplicity" (DN 338, at PageID # 2448);

(6)    Ineffective assistance of counsel at sentencing (DN 338, at PageID # 2450);

(7)    Ineffective assistance of appellate counsel, including for failure to challenge "the [§] 924(c)'s duplicity on appeal" (DN 338, at PageID # 2450; DN 377, at PageID # 2701);

(8)    Ineffective assistance of appellate counsel for failure to file a petition for writ of certiorari (DN 338, at PageID # 2450); and

(9)    Due Process violation (DN 377, at PageID # 2701).

However, at, the Court's evidentiary hearing, Hatton's counsel made an oral motion to withdraw

Hatton's third claim listed above.  (DN 436; DN 438, at PageID # 3194-95.)  As the undersigned

granted that motion at the hearing, the undersigned will include no analysis herein regarding that

claim.  The undersigned will address Hatton's remaining claims below and may address some claims together where the undersigned's analysis of the same overlaps.[3]

### 1.   Ground One: Failure to Investigate and Ground Two: Failure to Subpoena/Call Witnesses at Trial

Hatton claimed his counsel rendered ineffective assistance by failing to investigate a number of potential defenses including his alibi defense and his financial status after the bank robbery.  He also argued that counsel rendered ineffective assistance by not calling additional available witnesses to present these defenses.  Given the overlap between these two claims, the undersigned will address them together.

On his failure to investigate claims, it is undisputed that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  "Th[is] duty to investigate derives from counsel's basic function, which is 'to make the adversarial testing process work in the particular case.' " *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting in part *Kimmelman*, 477 U.S. at 384). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.  "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.' " *Towns*, 395 F.3d at 258 (quoting in part *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).  *See also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 525 (2003)) ("The duty to investigate does not force defense lawyers to scour the

---

[3] Hatton argued in his reply that the Court should not consider the United States' arguments in its response to his amended § 2255 motion because the response was untimely.  (DN 399, at PageID # 2808-10.)  However, the United States sought leave to file its response out of time (DN 398), and the Court granted that motion.  (DN 400.)  Accordingly, the undersigned will not readdress Hatton's timeliness arguments herein and will consider the arguments raised by the United States in its response (DN 401).

globe on the off chance something will turn up; reasonably diligent counsel may draw a line when

they have good reason to think further investigation would be a waste."); *Bigelow v. Williams*, 367

F.3d 562, 566 (6th Cir. 2004) (citing *Strickland*, 466 U.S. at 691, and *Wiggins*, 539 U.S. at 525)

("[T]he respect that attorneys' strategic decisions in a criminal trial will receive is proportionate

to the extent of the investigation they in fact conducted."); *Couch v. Booker*, 632 F.3d 241, 246

(6th Cir. 2011) (quoting in part *Strickland*, 466 U.S. at 690-91) (citations omitted) ("Competent

counsel can be expected to undertake a 'thorough investigation of law and facts relevant to

plausible options' for the defense.  And while this does not require counsel to investigate every

conceivable defense, any limitation on counsel's investigation must be supported by a 'reasonable

professional judgment.' ").

On his failure to present witnesses claim, under *Strickland,* "[a court] must presume that

decisions of what evidence to present and whether to call or question witnesses are matters of trial

strategy." *Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (citing *Hutchison v. Bell*, 303

F.3d 720, 749 (6th Cir. 2002)); *see also Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008)

(citing *United States v. Miller,* 643 F.2d 713, 714 (10th Cir. 1981)) ("[T]he decision of which

witnesses to call is quintessentially a matter of strategy for the trial attorney.").  In order "[t]o

present an ineffective assistance of counsel claim based upon a failure to call a witness, a defendant

must make an affirmative showing as to what the missing evidence would have been and prove

that the witness' testimony would have produced a different result." *Malcum v. Burt*, 276 F. Supp.

2d 664, 679 (E.D. Mich. 2003) (citing *United States ex. rel. Jones v. Chrans*, 187 F. Supp. 2d 993,

1009 (N.D. Ill. 2002)).

Hatton argued that Darling's investigation of potential defenses was not reasonable and

took particular issue with Darling's failure to investigate Hatton's alibi and Hatton's financial

status at the time of the robberies.  (DN 377-1, at PageID # 2702, 2705, 2708, 2710-11.)  As to his potential alibi defense, Hatton argued in his post-hearing brief that witnesses were available to demonstrate that "during the time period immediately following the bank robbery . . Hatton was at the hospital with his wife very soon after the robbery had been committed." (DN 441, at PageID # 3241.)  He argued that evidence showing he was at the hospital with his wife shortly after the bank robbery would have tended to show it was "unlikely that [he] could have committed the bank robbery at about 11:00 am, drove to a location to split the $120,000 in proceeds, later meet his wife at Wojciechowski's house and then travel to the hospital." (*Id.* at 3245.)  He faulted Darling for not investigating "the on duty nurse who could have testified to the time he and his wife were at the hospital." (*Id.* at 3247.)  He also noted that both L. Payton and K. Payton were available to verify that he was at the hospital "soon after the time of the bank robbery." (*Id.*)  He faulted Darling for not asking K. Payton about this during her testimony and for not calling his mother, L. Payton, at all despite her presence at the courthouse ready to testify. (*Id.* at 3247; DN 377-1, at PageID # 2702-03, 2713.)  Considering Hatton's arguments in light of the briefing and testimony at the evidentiary hearing, the undersigned concludes that Hatton has failed to show either deficient performance or prejudice on this issue.

Darling testified that he did investigate the timeline of the bank robbery but after doing so did not view it as exonerating given the gap between the robbery and Hatton's arrival at the hospital.  He testified that he did look into the medical records on this issue and noted that Hatton's son wasn't born until after midnight.  He stated in his testimony that it was his belief that presenting evidence of the timeline would have only proven that Hatton had opportunity to rob the bank, not the opposite.  He testified that giving that kind of opening to the prosecution was not something he wanted to do or thought was best.  As the United States noted in its post-hearing brief, the bank

robbery concluded at approximately 10:54 AM (DN 442, at PageID # 3256 n.2), whereas Darling mentioned in his opening statement that medical records would show that Sarah Hatton was admitted to the hospital at 2:57 PM in the afternoon (DN 229, at PageID # 1513).  This is a four hour gap in time.  As to other potential witnesses, Darling spoke with both K. Payton and L. Payton as part of his investigation.  Both testified that they knew Hatton was at the hospital on the day of the robbery but neither were present at the hospital with him and so neither had personal knowledge of his whereabouts on that day.  As to any alleged failure to investigate a nurse or other person who could have testified as to Hatton's whereabouts, Hatton has not identified or proffered the testimony of this individual to the Court for review and analysis.  In view of these facts, the undersigned finds that Darling's performance was not deficient. He did investigate the defense Hatton wanted him to raise and testified regarding the specific things he reviewed before concluding the defense was not in Hatton's best interests.  He also testified about his strategic thinking regarding calling K. Payton alone and not L. Payton given that he believed the former made a better witness than the latter and the latter's testimony would have been duplicative.  (DN 438, at PageID # 3209.)  While Darling's reference to an alibi defense in his opening statement at trial coupled with his failure to introduce any evidence on that point is curious at best, it does not change that Darling's decisions were precisely the kinds of strategic decisions left to counsel about what witnesses to call and what defenses to present. Thus, Hatton has not established deficient performance in view of the circumstances of this case.

As to prejudice, the undersigned agrees with Darling that the facts Hatton wanted Darling to elicit were less than exculpatory. Given the four hour gap between the bank robbery and Hatton's wife's admission to the hospital as well as the lack of any individual besides Hatton whose testimony could support his presence there, the undersigned cannot say that there is a

reasonably probability of a different outcome at trial had this information been presented.  A jury may have concluded—as Darling feared—that Hatton had plenty of time to rob the bank, split the money, and pick up his wife before the time she was admitted to the hospital.  A jury might instead have concluded that the proximity of the bank robbery to the birth of Hatton's child made it unlikely he would have participated in the robbery, though the undersigned finds the former view of the evidence far more likely than the latter.  In either case, given the rather ambivalent possibility of any change in the result of Hatton's trial, the undersigned finds that Hatton has failed to demonstrate the type and level of prejudice contemplated by *Strickland*.

As to his financial defense, Hatton argued that "witnesses were available to testify at trial that could demonstrate Mr. Hatton was broke and unable to pay rent, or even purchase food, during the time period immediately following the bank robbery."  (*Id.* at 3240-41.)  He argued that if Darling had presented evidence of his destitution at the time of the bank robbery, it would have served as a basis for the jury not to believe Hatton "had just committed a bank robbery and pocketed $60,000."  (DN 441, at  PageID # 3245.)  He reiterated his complaint that Darling should have asked K. Payton about this during her testimony and should have called L. Payton as well.  Here too, the undersigned concludes that Hatton has failed to demonstrate either deficient performance or prejudice.

Darling testified that as part of his investigation he talked with Hatton's family about Hatton's financial status around the time of the robbery and knew Hatton was "having a hard time of it."  (DN 438, at PageID # 3210-11.)  He noted his concern that to raise this strategy Hatton would have had to testify, which would have opened the door to too many issues in his opinion.  He also noted his skepticism that bank records or other evidence of financial status would have been helpful because "people who are bank robbers don't put that money in the bank."  (*Id.* at

3211.)  As to deficient performance, the undersigned finds that Darling's testimony demonstrates that Darling did make a reasonable investigation into Hatton's financial status and determined that further investigation was unnecessary.  The reasoning Darling offered on the stand about the lack of usefulness of the information and the danger of utilizing such a strategy supports a reasonable basis to refrain from further investigation or to call witnesses to present this defense, not a less than fully informed choice.  As to prejudice, the undersigned finds Hatton has failed to demonstrate a reasonable probability the outcome of his trial would have been different had Darling further investigated or presented witnesses on this defense.  While a jury might have believed that Hatton's financial status was proof he had not participated in the bank robbery, it seems more likely to the undersigned that such evidence would have been viewed as proof of Hatton's motive for bank robbery since the proposed testimony established that Hatton was experiencing financial difficulties both before and after the bank robbery.  In particular, had L. Payton testified at trial as she did during the evidentiary hearing that her son was so desperate for money that he was willing to rob someone, the undersigned cannot imagine that testimony doing anything but giving the United States a perfect soundbite to use in its closing argument to establish Hatton's motive.  (*Id.* at 3181-82.)  Hatton has failed to prove a reasonable possibility that either further investigation by Darling into his financial status or presenting witnesses on that issue would have altered the outcome of the trial.

Having rejected both areas in which Hatton claimed his counsel's investigation and trial strategy was unreasonable, the undersigned recommends that Hatton's § 2255 Motion be **DENIED** as to what the undersigned has identified as Grounds One and Two.

### 2. Ground Three: Hatton's Trial Testimony

As Hatton withdrew Ground Three at the evidentiary hearing in this matter, no merits analysis of the same is necessary.

### 3. Ground Four: Counsel Unprepared for Trial

Hatton argued that his counsel was unprepared for trial, citing numerous instances in the record where Darling requested an extension. (DN 377-1, at PageID # 2719.) Hatton emphasized that Darling needed more time to investigate and prepare for trial and that Darling requested a continuance only two days before trial began. (DN 441, at PageID # 3248.)

The undersigned finds that Hatton has failed to demonstrate deficient performance on this issue. Darling testified at the evidentiary hearing that he reviewed discovery from the United States and that in his estimation, discovery was more voluminous than normal given how many state court materials were included. He testified that he looked into some of the defenses he and Hatton discussed including those related to Hatton's limp, Hatton's potential alibi, and Hatton's financial status, though he ultimately decided only to use the first of the three at trial. He testified that he reviewed *Jencks* material he requested in preparation to deal with the testimony of Hatton's co-defendants. He testified that while he requested a continuance shortly before trial, he did so because Hatton had asked him to because Hatton had not had a chance to look at the discovery. When the continuance was overruled, Darling testified that he "had everything [he] needed" to go forward and that he believed he did effectively prepare for trial. (DN 438, at PageID # 3225.) Darling's testimony and the fact that the continuance requested shortly before trial was initiated at Hatton's request is substantiated by what Darling told the Court in support of his request at the time he made it. (DN 235, at PageID # 1871.) Review of the procedural history of Hatton's case and the transcripts of court conferences demonstrates that Darling knew what he needed to do to

prepare and requested the necessary time from the Court to complete those tasks. For example, when the Parties' focus shifted from plea negotiations, Darling requested an additional continuance to continue to review discovery he has testified was voluminous. This suggests diligent preparation, not unpreparedness. In view of these circumstances and based on the undersigned's review of the transcript of the trial at which Darling did cross-examine witnesses and present one witness supportive of Hatton's limp defense, Hatton has failed to establish deficient performance. Darling reviewed discovery, spoke with witnesses, spoke with Hatton regarding his defenses, and made reasonable decisions about the defense to be presented at trial. While Darling may have made some other statements to the Court at earlier status conferences in the case that suggested he was not prepared then, by the time of trial, the record establishes that Darling was prepared. The undersigned cannot find that Darling was anything less than the counsel guaranteed by the Sixth Amendment, and to find otherwise, the undersigned would have to engage in the type of second-guessing Darling's decisions and strategy in which courts have been repeatedly told not to engage. *See Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). A defendant is "entitled to a competent defense, but not a perfect one." *Thomas v. United States*, 849 F.3d 669, 678 (6th Cir. 2017) (citing *Crehore v. United States*, 127 F. App'x 792, 796 (6th Cir. 2005)). Hatton may have wished Darling made different strategic choices, but those choices and the amount of preparation Darling did for trial are the not the type of deficient performance cognizable under *Strickland*.

As to prejudice, the undersigned also finds that Hatton has failed to establish what additional time or unspecified preparation would have done to change the outcome of his trial. Other than what the undersigned rejected in his analysis of Grounds One and Two above, Hatton has specified no additional investigation that might have changed the outcome of events. Hatton has also not specified what Darling could have done—again, other than those grounds already rejected by the undersigned—in any additional time to get prepared other than what Darling testified he had already done. As such, Hatton has failed to establish any prejudice from Darling's trial preparation.

Accordingly, the undersigned recommends that Hatton's § 2255 Motion be **DENIED** as to what the undersigned has identified as Ground Four.

### 4.      Grounds Five to Eight: Claims from initial § 2255 motion

Grounds Five to Eight of Hatton's § 2255 Motion were all first raised in his initial *pro se* motion that Magistrate Judge Whalin recommended be summarily dismissed. Judge Whalin summarized that Hatton "ha[d] not alleged a viable claim of ineffective assistance of counsel merely by using the term repeatedly in the captions of his motion to vacate without providing any meaningful factual detail or development of his legal arguments." (DN 345, at PageID # 2480.) The undersigned agrees. In what the undersigned has designated as Ground Five, Hatton alleged, "Counsel's failure to challenge 924(c)'s during in relation to the Duplicity of the Hobbs Act conspiracy and Hobbs Act Robbery violates the Sixth Amendment Right to Counsel during trial." (DN 338, at PageID # 2448.) In what the undersigned has designated as Grounds Six to Eight, Hatton alleged ineffective assistance of counsel at sentencing and on appeal, stating, "Counsel's failure to raise meritable [*sic*] claims or to challenge the 924(c)'s Duplicity on Appeal constitutes Ineffect [*sic*] Assistance of Counsel during the sentencing and on Appeal and failure of counsel to

seek an [*sic*] writ of certiorari to further the appeal to the United States Supreme Court." (*Id.* at 2450.)  As noted by Magistrate Judge Whalin in his initial recommendation, these claims are less than specific regarding the claimed ineffective assistance of counsel, leaving the Court to guess at, among other things, what Hatton means by duplicity, what specifically about the jury instructions was deficient, how counsel deficiently performed at sentencing, which of the issues his counsel did raise on appeal merited further review by the Supreme Court, how any such further review would have altered the outcome on appeal, and what meritorious issues his counsel failed to raise on appeal.  (*See* DN 345, at PageID # 2481-83.)  Despite mentioning a conspiracy charge, he also did not acknowledge that he was neither convicted of nor sentenced on that charge.  (DN 252, at PageID # 1951.)  Unlike with his other ineffective assistance claims addressed above, Hatton did not supplement Grounds Five to Eight in his amended § 2255 motion or subsequent filings. Without amendment, these grounds remain just as deficient as stated by Magistrate Judge Whalin.

As noted above, it is Hatton's burden to demonstrate he received ineffective assistance of counsel.  Conclusory statements regarding ineffective assistance are insufficient to sustain this burden of proof.  *See Elzy*, 205 F.3d at 885-86 (holding that one-sentence, conclusory statement regarding ineffective assistance was "wholly insufficient to raise the issue of ineffective assistance of counsel"); *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) (holding that a defendant's general, conclusory, and perfunctory arguments were insufficient to overcome "the presumption of reasonable professional assistance" applicable to claims of ineffective assistance of counsel). And even liberally construing his filings given his *pro se* status at the time of filing his initial § 2255 motion as required, this Court is not required "to conjure allegations on a litigant's behalf." *Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594

(6th Cir.1989)).  The Court would be required to do so to consider Hatton's Grounds Five to Eight, and therefore, the undersigned finds them deficient.

Thus, the undersigned recommends that Hatton's § 2255 Motion be **DENIED** as to what the undersigned has identified as Grounds Five to Eight.

### 5.    Ground Nine: Due Process

In his amended § 2255 motion, Hatton listed as a ground for relief that he "was denied due process of law as guaranteed by the Fifth Amendment, U.S. Constitution." (DN 377, at PageID # 2701.)  For his supporting facts, Hatton directed the Court to "[s]ee attached pages marked 5-1 thru 5-26." (*Id.*)  However, those pages appear to contain only citations to facts and authority related to his claims for violations of his Sixth Amendment right to effective assistance of counsel. *See Strickland*, 466 U.S. at 684-86.  Nowhere therein is any "due process" claim referenced or are the facts and legal arguments supporting the same laid out.  Without these facts and authorities, the Court is—as with Grounds Five to Eight above—left to guess at what Hatton could be intending.  Likewise, as this claim appears to be a standalone clam for violation of the Due Process clause, without a more specific articulation of the same, the undersigned cannot assess whether Hatton raised this claim on appeal or whether it is procedurally defaulted and if so, whether Hatton has demonstrated the required cause and prejudice for this Court to consider his claim any default notwithstanding.  But it is inappropriate for the undersigned to make Hatton's arguments on this issue for him, which is what Hatton's filings would force the undersigned to do to consider the instant claim. *Erwin,* 22 F. App'x at 580 (citing *Wells*, 891 F.2d at 594).  Thus, the undersigned finds that Hatton has failed to state a valid claim for any due process violation.

The undersigned recommends that Hatton's § 2255 Motion be **DENIED** as to what the undersigned has identified as Ground Nine.

### C.      Certificate of Appealability

Having found that all grounds asserted in Hatton's § 2255 Motion are meritless, the final issue is whether Hatton is entitled to a Certificate of Appealability ("COA") pursuant to 28 U.S.C. § 2253(c)(1)(B) on any or all of the claims raised in his motion.  An appeal from a denial of a § 2255 motion may not proceed unless a judge issues a COA for the claim.  28 U.S.C. § 2253(c)(1)(B).  To obtain a COA when a court rejects a defendant's claim on the merits, the defendant must demonstrate that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The defendant need not demonstrate the claim will prevail on the merits; he or she need only demonstrate that the issues he or she seeks to appeal are deserving of further proceedings or debatable among jurists of reason.  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quoting *Gordon v. Willis*, 516 F. Supp. 911, 913 (N.D. Ga. 1980)); *Slack*, 529 U.S. at 483-84.  To obtain a COA when a court rejects a claim on procedural grounds, the defendant must demonstrate (1) that "jurists of reason would find it debatable whether the [§ 2255 motion] states a valid claim of the denial of a constitutional right" and (2) that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 478, 484.  A court need not conduct the two-pronged inquiry in the order identified or even address both parts if the movant makes an insufficient showing on one part.  *Id.* at 485.

As to Grounds One and Two, the undersigned found above that Hatton had failed to demonstrate either deficient performance or prejudice as to any of the areas he claimed his counsel failed to investigate or should have called additional witnesses to explore at trial.  Based on the facts as presented at the hearing and on the relative futility of the areas Hatton wanted his counsel to investigate further and use at trial, the undersigned finds that reasonable jurists would not find

the undersigned's assessment of the constitutional claim debatable or wrong or that Hatton's claim was deserving of further proceedings.  Thus, the undersigned **RECOMMENDS** that a COA be denied as to Grounds One and Two.

Ground Three was withdrawn by Hatton at the evidentiary hearing, and therefore, no COA analysis of it is necessary.

As to Ground Four, the undersigned found above that Darling's testimony contradicted Hatton's allegations that Darling was unprepared for trial.  Based on the evidence presented at the hearing, the undersigned finds that reasonable jurists would not find the undersigned's assessment of the constitutional claim debatable or wrong or that Hatton's claim was deserving of further proceedings.  Thus, the undersigned **RECOMMENDS** that a COA be denied as to Ground Three.

As to Grounds Five to Eight, the undersigned echoed the earlier conclusion of Magistrate Judge Whalin that Hatton's conclusory allegations devoid of factual support were wholly insufficient to state colorable claims of ineffective assistance meriting analysis by the Court.  Given the conclusory and vague nature of Hatton's claims, the undersigned finds that reasonable jurists could not debate whether Hatton stated valid claims of ineffective assistance of counsel.  Thus, the undersigned **RECOMMENDS** that a COA be denied as to Grounds Five to Eight.

As to Ground Nine, the undersigned found that Hatton's general reference to a "due process violation" was insufficient to raise any such claim in the absence of more specific supporting facts or legal arguments.  Given the perfunctory and conclusory nature of Hatton's claim, the undersigned finds that reasonable jurists could not debate whether Hatton stated a valid claim for a due process violation.

## III.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Hatton's § 2255

Motion (DNs 338, 377) be **DENIED** and that a Certificate of Appealability be **DENIED** as to all

claims therein advanced.

Colin H Lindsay, Magistrate Judge

United States District Court

cc:  Counsel of record

April 20, 2023

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Crim. P. 59(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).